IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

SHAWN GENTRY, HOA NGUYEN, THAO NGUYEN,
TAN HUYNH DUONG, TRAN HUYNH DUONG,
TRUC HUYNH DUONG, and TU NGUYEN HUYNH,
Individually and as Representative of the Estate of
UYEN THI DUONG, Deceased                                                    PLAINTIFFS

VS.                                              CIVIL ACTION NO. 3:23-CV475-MPM-RP

ROBINSON PROPERTY GROUP, LLC
d/b/a HORSESHOE TUNICA                                                      DEFENDANTS

**ORDER**

This cause comes before the court on the motion of defendant Robinson Property Group, LLC d/b/a Horseshoe Tunica ("Horseshoe") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiffs Shawn Gentry *et al* have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This case arises out of a February 26, 2023 incident in which plaintiffs, a group of gamblers who had gambled at the Horseshoe Casino in Tunica ("the casino"), fell victim to a drive-by shooting near the intersection of Shelby Drive and Third Street in Memphis, Tennessee. At the time of the shooting, plaintiffs were passengers in a vehicle being driven from the casino to the Memphis airport, and it is undisputed that Horseshoe had arranged this transportation for them. The vehicle in question was owned by a company named Memphis Bell, which plaintiffs initially sued in this action, before voluntarily dismissing their claims against it. [Docket entry 131-1]. In describing their version of the facts in this regard, plaintiffs allege in their amended complaint that:

> 18. On February 26, 2023, following one of these solicited trips where Plaintiffs had gambled at the Tunica resort, TUNICA once again undertook the safety of ensuring

1

> Plaintiffs remained safe in their casino as well as in their transportation to the airport. TUNICA facilitated the transportation to the airport by securing their own private transportation with MEMPHIS BELL, with whom TUNICA regularly does business. However, on this particular trip, although Plaintiffs had just gambled at the Tunica resort, Defendants TUNICA and MEMPHIS BELL acted negligently in their undertaking of providing ensuring Plaintiffs' safety and security, and safely and securely transporting them. Specifically, on February 26, 2023, while MEMPHIS BELL was transporting Plaintiffs to the airport, Plaintiffs fell victim to a barrage of gunshots as an attempted robbery unfolded. Unfortunately, as a result of the attempted robbery, Plaintiffs were severely injured.

[Amended complaint at 6]. Horseshoe has presently moved for summary judgment, arguing that there is no genuine issue of fact regarding its liability in this case and that it is entitled to judgment as a matter of law.

Given that this is a negligence case as to which Mississippi state law applies, this court will briefly discuss the familiar legal principles which apply in this context. "It is well established that recovery in a negligence action requires proof by a preponderance of the evidence of the conventional tort elements: duty, breach of duty, proximate causation, and injury (i.e., damages)." *Perez v. Univ. of Miss. Med. Ctr.,* 75 So.3d 609, 611 (¶ 12) (Miss. Ct. App. 2011) (citation and internal quotation marks omitted). It is likewise clear that, to survive summary judgment, the plaintiff must rebut the defendant's claim that no genuine issue of material fact exists by producing supportive evidence of significant and probative value; this evidence must show that the defendant breached the established standard of care and that such breach was the proximate cause of the injury. *Perez,* 75 So.3d at 611. With regard to the crucial element of causation, Mississippi appellate authority provides that:

> Proximate cause is a concept which is more accurately defined by reference to the distinct concepts of which it is comprised, which are: (1) cause in fact; and (2) foreseeability. Cause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred. Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others.

*Davis v. Christian Bhd. Homes of Jackson, Miss. Inc.,* 957 So.2d 390, 404 (¶ 32) (Miss. Ct. App. 2007) (internal citations and quotation marks omitted).

In applying this authority in this case, this court will address what it regards as plaintiffs' two primary avenues of establishing fact issues regarding negligence in this case. The first of these avenues relates to Horseshoe's alleged failure to take appropriate action in response to an African-American man, whose actions were caught on the casino's video, allegedly showing an unusual degree of interest in the activities of the members of plaintiffs' group. As to this allegation, plaintiffs write in their brief that:

> Notably, on the weekend in question when Plaintiffs were gambling on the casino floor, Tunica's surveillance personnel identified an individual engaging in the exact type of "unusual" and "suspicious" casing conduct that Tunica's policy purports to prohibit. *See, e.g.,* Jason Williams Dep. at 13:25-14:10 ("we identified an individual that we did not know to be a part of this group spending a significant amount of time with the group"). While Mr. Williams (Tunica's surveillance director) initially characterized the individual's behavior as unusual but not suspicious *(see* Jason Williams Dep. at 14:9-10), he later admitted that such behavior-including "someone that's consistently not gaming who is always in the line of sight of another individual that is tracking or following another individual or someone that's disengaged and constantly looking around, avoiding other team members on the casino floor, things of that *nature"-was indeed* "suspicious." *See* Jason Williams Dep. at 33:6-18. Importantly, this is exactly the kind of behavior Tunica's surveillance system caught on camera during the subject weekend. *See* Exhibit I, Expert Report of Mark Meredith, at 7-9. And Nicholas Nguyen testified that a tall, lanky African-American man appeared to be casing Plaintiffs' gaming activities. *See* Nicholas Nguyen Dep. at 47:8-49:7. Perhaps most important, Tunica's video surveillance system captured *the very same individual* engaging in *the very same behavior. See* Exhibit L, Tunica's Video Surveillance Footage. And, yet-inexplicably-Tunica failed to act, and it admits this constituted a violation of its own policies.

[Brief at 8]. In addressing the actions which, in their view, the casino should have taken, plaintiffs write that "there is no indication in the record that Tunica personnel responded accordingly and told the individual 'to move along' or otherwise confronted him." [Brief at 8].

While this court regards this as an interesting theory of liability, it does not withstand even the most cursory application of basic negligence principles, most notably those relating to

3

causation. Indeed, it seems clear that plaintiffs have failed to establish fact issues regarding either the "cause in fact" or "foreseeability" prongs of the proximate causation standard. As quoted in *Davis* above, "[c]ause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred." Of course, this means that, as to the mysterious gentleman in the video, the only possible way in which any decision by casino employees to tell him to "move along" would have had any impact upon the eventual shooting in this case is if that individual was the same one(s) who fired at the vehicle in which plaintiffs were driving. Plaintiffs have no evidence whatsoever that this was, in fact, the same individual, and this strikes this court as being a particularly glaring omission, considering that this case involves a violent crime which was investigated by Memphis police.

It strikes this court that, if there were actually something to plaintiffs' theory, then they could have presented the video in question to police and, possibly, have produced some actual evidence in this regard. This court highly doubts that such evidence would have ever been forthcoming, since, as discussed below, it seems certain that the individual in the video was not, in fact, the same one who committed the shooting in this case. In so stating, this court notes that, aside from the fact that the shooting occurred thirty miles away from the casino, it appears to be undisputed that there was no robbery or attempted hi-jacking in this case, which might have suggested that the individuals involved were the same. In this vein, this court notes that, if the crime had involved plaintiffs' vehicle being stopped by individuals who seemed to know that they would have money on them, then this might at least constitute *some* circumstantial evidence in this regard. As it stands, however, plaintiffs offer nothing more than the barest speculation in support of their theory.

4

This court notes that defendant has provided its own version of the facts in this regard, as follows:

> First, Plaintiffs traveled to Horseshoe Casino in Tunica on February 24, 2023 and gambled until the early morning hours of February 26, 2023. At no point during their visit did any of the Plaintiffs express any safety concerns to Horseshoe, including concerns that individuals may have been watching, or casing, them during their visit. Then, at approximately 4:35 A.M. on February 26, 2023, Plaintiffs entered Memphis Bell's private limousine vehicle to travel back to the Memphis International Airport to return to the Houston, Texas area. While traveling on a public roadway (U.S. Highway 61) in Memphis, Tennessee, Plaintiffs were shot by unknown, criminal third-parties. After Plaintiffs were taken to the hospital by Memphis Bell, Nick Nguyen told Hoa Nguyen that Nick and Tu may have been watched for three to four minutes by an individual while playing Midi Baccarat and that it was his "hunch" that the shooting in Memphis could be related to he and Tu being watched. Hoa relays Nick Nguyen's "hunch" to his partner, Shawn Gentry, and others. Based upon Nick Nguyen's "hunch" and nothing more, Plaintiffs filed their lawsuit against Horseshoe Casino and Memphis Bell. The parties then engage in discovery, and Defendants take the depositions of all Plaintiffs. During their depositions, all Plaintiffs admit that they have no evidence or testimony linking Horseshoe Casino (or any occurrence at Horseshoe Casino) to the drive-by shooting carried out by unknown, criminal third parties in Memphis, Tennessee. Defendants then take the deposition of Nick Nguyen (the individual whose "hunch" is the sole basis for this lawsuit). Notably, Nick testified that his "hunch" was purely speculation on his part and that he did not have any proof, evidence, knowledge, or testimony that could link Horseshoe to the random drive-by shooting in Memphis, Tennessee.

[Brief at 13-14].

This court is required, at this juncture, to view the facts in the light most favorable to plaintiffs, as the non-moving parties, but, even doing so, defendant seems quite correct that their theory of the case is based on nothing more than a "hunch," and not a particularly strong one at that. Moreover, it goes without saying that any negligence on the part of the casino in failing to tell the man in the video to "move on" would not have been a cause in fact of the shooting in this case if that individual had nothing to do with the shooting. As discussed below, it seems certain that this is the case. Moreover, even if the individuals involved were, in fact, the same, it seems exceedingly doubtful that an individual who was prepared to spray a vehicle full of passengers

5

with bullets would have been dissuaded from doing so by being told by a casino security guard to "move along," or words to that effect.

This court therefore concludes that plaintiffs' theory of liability fails for lack of evidence of causation in fact, but, even if it did not, they would still be unable to demonstrate that the "foreseeability" prong of the proximate causation standard is met in this case. In so stating, this court notes that, while having a customer's casino chips stolen may be a foreseeable result of failing to confront an individual showing undue interest in a group's activities on a casino floor, a violent shooting thirty miles away is clearly not. In a related vein, this court observes that any duty of care which the casino may have owed to plaintiffs in this regard related solely to the casino premises which it controlled. Indeed, this court wonders: do plaintiffs contend that any casino employees who witnessed a customer showing undue interest in other patrons have a duty, once that suspicious individual leaves the premises, to dispatch an employee to trail him for thirty miles across state lines, to make sure he is not setting up an ambush on plaintiffs? Obviously not. This court therefore concludes that plaintiffs' claims would lack merit even if there were, in fact, a mysterious individual in the video who demonstrated an unusual degree of interest in their activities on the casino floor. It seems clear that this is not the case, for reasons which this court will presently explain.

In their briefing, plaintiffs attempt to buttress their "mystery man" theory with a highly selective and disingenuous interpretation of the deposition testimony of defendant's employees. In its reply brief, defendant accuses plaintiffs of outright misrepresenting the testimony of its representative Jason Williams in their briefing, and, after considering this evidence, this court does not regard this as an unfair characterization. For example, defendant writes in its brief that:

> First, Plaintiffs misrepresent testimony from Jason Williams, the Director of Surveillance at Horseshoe casino, who oversees a team of individuals charged with surveilling the

6

> premises through a network of CCTV security cameras. Following the shooting in Memphis, Williams and his team searched the names of each individual Plaintiff and "backtracked" their stay. See Jason Williams Depo. at p. 12:15-21 attached as Exhibit 3. This effort resulted in obtaining CCTV footage of the entirety of each Plaintiff's stay (excluding bathrooms and guest bedrooms) which was reviewed by Williams and his team. During that review, Williams' team noticed an individual with the group who they classified as "unusual." Ex. 3 at p. 14:5-10. That individual was Aaron Walker, a local resident of Mississippi who Plaintiffs Shawn Gentry and Hoa Nguyen later testified was invited by Gentry and Hoa to spend a romantic weekend with Gentry and Hoa to celebrate Gentry's birthday. Walker's joining the group was the only irregularity observed by Williams' team as he was the only "stranger" who interacted with the group while on-property. *Id.*
> Notably, Williams testified twice in his deposition that he found no evidence of the plaintiffs being cased. Ex. 3 at pp. 19:16-21 and 20:3-6. Yet, in direct contradiction of that testimony, Plaintiffs state in their Response that "Tunica's surveillance personnel identified an individual engaging in the exact type of 'unusual' and 'suspicious' casing conduct that Tunica's policy purports to prohibit." [Doc. 120] at p. 7. The testimony Plaintiffs cite for their blatant misrepresentation that Horseshoe's surveillance team observed "casing conduct" is Williams' testimony discussing **Aaron Walker** – *the individual invited into the group by Gentry and Hoa*. Ex. 3 at pp. 14:5 – 16:12. Plaintiffs then attempt to take Williams's testimony specific to Aaron Walker and blend/apply it to the "unidentified black male" that is the subject of Nick Nguyen's purported hunch, despite never actually asking Williams (or anyone else from Horseshoe) about the unidentified black male and despite **Williams previously testifying that surveillance found no evidence of Plaintiffs being cased**.

[Brief at 5-6 (emphasis in original)].

After reviewing the evidence, this court concludes that defendant is quite correct in arguing that plaintiffs misrepresented Williams' testimony to support their theory that a mysterious individual was casing them out in this case. Defendant further appears correct in arguing that Williams witnessed a specific known individual – Aaron Walker – who not only was **not** a criminal casing out plaintiffs, but, rather, was an invited guest of the group. That being the case, plaintiffs' attempts to manufacture some sort of mystery criminal out of the evidence in this case is difficult to excuse. Moreover, when this court concludes that a litigant is attempting to "pull a fast one" on it with regard to a particular argument or theory of liability,

7

then this necessarily colors its view of that litigant's claims as a whole and renders it less likely to grant any benefit of the doubt regarding factually unsupported allegations on other claims.

In the court's view, plaintiffs' lack of a good faith belief in their own "mystery man" theory can also be seen from the manner in which they utilize the video evidence in this case. In so stating, this court notes that plaintiffs have attached to their motion a lengthy video including close to two-and-a-half hours of surveillance footage of dozens of individuals on a casino floor. This court has reviewed this video, which strikes it as being totally unremarkable footage of casino floor activity, and, having done so, it is at a complete loss to understand exactly what activity in the video was supposed to have signaled to casino personnel that there was a man who posed a danger to the plaintiffs in this case. Plaintiffs appear to have no interest whatsoever in assisting this court in this regard, since, in their brief, they simply cite the footage as a whole without any attempt to clarify exactly which of dozens of individuals in that video committed which specific suspicious act(s) at which particular point in time in the video. *See* Plaintiffs' brief at 8, merely citing "Exhibit L, Tunica' s Video Surveillance Footage." These are not the acts of plaintiffs who have a good faith belief in their own theory of the case.

This court's experience is that, when litigants truly believe that a video supports their claims, they are only too eager to highlight whichever portion of the video does so. The plaintiffs in this case, by contrast, would merely have this court take their word for it that, somewhere in the hours of video footage, one of the dozens of people in the video were recorded engaging in "casing" behavior. This court notes that, at certain points in the video, certain individuals can be observed watching others play cards. If this is the "casing" behavior to which plaintiffs refer, then it strikes this court as being extremely weak evidence of such because, in its experience, some people at casinos simply like to watch others play cards. Moreover, while

8

Williams testified that he did identify one individual from outside the group who seemed to be showing interest in its members, this was clarified when the individual in question was identified as Walker, an invited guest of the group. Of course, plaintiffs are well aware of this fact, which makes their efforts to selectively cite Williams' testimony to support their "mystery man" theory quite reprehensible.

Finally, this court notes that any attempt by plaintiffs to recover for negligence by casino employees in monitoring on-premises activity would be subject to the highly stringent provisions of the Mississippi's Landowners Protection Act (Miss Code Ann. §11-1-66.1) ("the MLPA" or "the Act"). Plaintiffs have not even attempted to establish that they can meet the requirements of this Act, instead contending that, since this case involved a shooting in Memphis, it is not a premises liability claim at all. In so arguing, plaintiffs ignore the fact that their own brief seeks to argue that negligence by defendant's employees in monitoring activity on the casino floor gave rise to its liability in this case, and this strikes this court as being a rather classic premises liability argument. This court merely notes the MLPA in passing, since it regards the provisions of that Act as being complete overkill in this case, since plaintiffs' entire "mystery man" theory seems entirely meritless even under ordinary negligence principles. This court therefore concludes that any claims by plaintiffs alleging that defendant was negligent in failing to confront an allegedly suspicious individual on the casino floor are completely without merit and are due to be dismissed.

That brings this court to plaintiffs' other primary theory of liability in this case, relating to the decision by defendant to hire an allegedly unqualified driving service, Memphis Bell, to transport plaintiffs. This court regards this theory of liability as being on a slightly higher plane than plaintiffs' "failure to confront" theory, simply because it is not a blatantly frivolous one.

9

This court concludes that this fact may serve to spare plaintiffs from an imposition of attorneys' fees in this case, but, in so stating, it does not mean to suggest that it is a meritorious claim. To the contrary, while plaintiffs make boilerplate allegations that defendant failed to properly vet Memphis Bell before arranging for it to transport plaintiffs to and from the casino, they never provide any specific arguments, much less proof, explaining what defects this company might have had which rendered the shooting in this case a foreseeable result of the decision to hire them.

This court regards plaintiffs' burden of making plausible arguments in support of a negligent hiring claim as being particularly difficult in this case, given the extremely unusual nature of the shooting in this case. As a federal judge, this court has considerable experience in dealing with criminal matters, and it regards a fact pattern in which individuals fire shots into an occupied vehicle, with no apparent attempt to rob it, as being a highly unusual and unforeseeable one, even in a dangerous area of a large city. That being the case, this court believes that it was incumbent upon plaintiffs to offer much more than vague and generalized recitations that defendant failed to "properly vet" Memphis Bell, if they wish to assert a plausible claim that negligence in hiring was the proximate cause of their injuries in this case. Plaintiffs have failed to do so.

This court further concludes that Memphis Bell acted as an independent contractor in this case, and, that being the case, Horseshoe is not subject to vicarious liability for any specific acts of negligence on its part. In contending otherwise, plaintiffs argue that some sort of partnership or joint venture arose between Horseshoe and Memphis Bell in this case, but this court agrees with defendant's argument that:

> [T]here is no joint venture between Memphis Bell and Horseshoe Casino and there can be no imputed negligence or potential liability. There are three main factors of partnership,

> and by extension joint venture: (1) intent, (2) control, and (3) profit sharing. *Smith v. Redd*, 593 So. 2d 989, 993 (Miss. 1991). Here, there is no profit sharing between Horseshoe and Memphis Bell. Marcus Bell (owner of Memphis Bell) testified that he submits invoices for payment following his company transporting guests to and from the casino. (Ex. 9, Marcus Bell Dep. 33:17-22). Horseshoe does not exercise control over Memphis Bell and Memphis Bell ultimately has the discretion to take whatever route is needed as circumstances dictate. (Ex. 9, Marcus Bell Dep. 43:14 – 44:25). And finally, Memphis Bell is an independent contractor who is wholly independent of Horseshoe Casino in ownership and control. Stated differently, there is no contract or evidence of any intent as to Horseshoe Casino and Memphis Bell to be in a joint venture together. Memphis Bell is simply an independent contractor that provides services to Horseshoe Casino on an "as-needed" basis for a fee that is paid directly to Memphis Bell. Plaintiffs' partnership claim fails.

[Brief at 25].

As noted previously, plaintiffs initially named Memphis Bell as a defendant in this case, before later voluntarily dismissing their claims against it. It is unclear to this court why plaintiffs elected to do so, although it seems likely that they chose to seek recovery against the defendant with the deeper pockets. If that is the case, then plaintiffs' decision considerably reduces their options for obtaining recovery in this case. This court further notes that, even if it is incorrect in its above analysis and Horseshoe can somehow be held vicariously liable for the negligence of Memphis Bell, then plaintiffs still offer exceedingly weak testimony that the allegedly dangerous route chosen by its driver was a proximate cause of the shooting in this case. In their brief, plaintiffs write that:

> In the end, the consequences of Woods' negligence was devastating, as Memphis Bell carelessly routed Plaintiffs through gang-infested neighborhoods of Memphis rather than taking the usual, more direct (and far safer) route to the airport. *See* Shawn Gentry Dep. at 92:7-15 (explaining that the Memphis Bell driver took Plaintiffs "on the bad roads" in parts of Memphis known as a "gang area").

[Brief at 10].

In the court's view, the self-serving assertion of one of the plaintiffs that Memphis Bell's driver took the "bad roads" to the airport is plainly insufficient to create fact issues regarding

11

whether the route chosen to the airport was the proximate cause of their injuries. In the court's view, this is the sort of matter that would best be proven by the testimony of an expert witness offering comparative analysis of the relative safety profiles of the route chosen by Memphis Bell's driver with the one which, the expert contends, should have been taken. This court believes that any analysis in this regard should also consider the relative travel times of each route, and it believes that it should also take into account the fact that the shooting which occurred in this case was an exceedingly rare event, even in a "bad neighborhood." Plaintiffs offer no such expert testimony, and this court finds Gentry's vague, conclusory and self-serving testimony in this regard to be plainly insufficient to establish fact issues regarding the negligence of Memphis Bell's driver.

While this court therefore finds that plaintiffs lack sufficient proof of negligence in this case – by anyone – it also agrees with defendant's argument that, even if some degree of negligence is presumed, then the shooting in this case was a superseding cause of the plaintiffs' injuries in this case. In this vein, this court agrees with defendant's argument that:

> More specific to this case, however, is the well-established premise that "[g]enerally, criminal acts can be intervening causes which break the causal connection with the defendant's negligent act, if the criminal act is not within the realm of reasonable foreseeability."9 *Williams ex rel. Raymond v. Wal-Mart Stores, East, L.P.*, 99 So. 3d 112, 113 (Miss. 2012). In the instant case, a drive-by shooting in Memphis after the Plaintiffs left Horseshoe's property, which is "a criminal act, beyond mere negligence," could not have been reasonably foreseeable to Horseshoe under the considerations of the Act or any other inquiry at law. *Thornton v. Big M. Transp. Co.*, 146 So. 3d 393, 401 (Miss. Ct. App. 2014).
> As set forth in the *Williams* case, Walmart negligently sold ammunition to a minor in violation of state and federal law, which the minor then, under the influence of alcohol, used to negligently shoot and kill his mother's boyfriend the next evening. *Williams*, 99 So. 3d 112, 114-15 (Miss. 2012). Though Walmart was negligent, summary judgment was proper in the case as the "'shooting . . . was a criminal act, beyond mere negligence. Further, nothing in the record suggest[ed] at the time of purchase, Walmart had any reason to believe that [the minor] would commit a criminal act.'" Id. at 120." (Phillips v. Wal-Mart Stores East LP, 2015 U.S. Dist. LEXIS 82073 at *14 fn. 3, Civil No. 5:14-cv-35-DCB-MTP (S.D. Miss. June 24, 2015).

[Brief at 21-22].

This court likewise agrees with defendant that the six-part superseding cause standard set forth in *Southland Mgmt. Co. v. Brown ex rel. Brown*, 730 So. 2d 43, 46 (Miss. 1998) supports their position in this case, for the reasons stated in its brief. [Brief 20-21]. This court notes that, in arguing otherwise, plaintiffs dredge up, once again, their utterly discredited "mystery man" theory, arguing that:

> [I]n this case, contrary to Tunica's conclusory assertion otherwise, Tunica's negligence was *the very thing* that permitted the intervening act to occur (as such, the shooting and attempted robbery did *not* bring about a harm different in kind from that which would have otherwise resulted from Tunica's negligence because the purpose behind the casing was to plan the armed robbery). In other words, there is *at the very least* a fact issue in this case *that-but for* Tunica's negligence in failing to confront or in any dissuade the individual shown in the video from casing the casino floor-the subsequent shooting and attempted robbery would not have occurred.

[Brief at 19].

This argument is incorrect on so many different levels that this court scarcely knows where to begin in addressing it. Rather than doing so in any depth, this court would simply reiterate its prior findings that, even if there were an actual "mystery man" depicted in the video who was actually involved in the shooting (which there was not), then any failure by casino security to tell him to "move along" would still not be a proximate cause of the shooting in this case. That aside, this court reiterates that plaintiffs use the testimony of defendant's representative Williams to establish their "mystery man" theory in the first place, and, once again, he was clear that the man whose potential "casing" behavior initially caught his attention later proved to be none other than Aaron Walker, an invited guest of plaintiffs' group. [Williams deposition at 15]. This court notes that Williams testified in his deposition that, even initially, he did not regard the behavior of the man in the video as "suspicious," but only "unusual." [*Id.*

13

at 14]. Even if this court is to assume that some slight degree of concern was raised by the conduct of the man in the video, it was quickly dispelled once he was identified as a guest of plaintiffs' group.

The fact that plaintiffs have nevertheless continued to promote this discredited "mystery man" theory, even after it was discredited, strongly tempts this court to grant defendant's request that it be awarded attorneys' fees. After careful consideration, this court will refrain from doing so, based partly upon the fact that the plaintiffs in this case did suffer a grievous attack while using the transportation arranged by defendant. That being the case, plaintiffs did suffer legitimate and serious injuries while on their trip to defendant's casino, and this case can thus be distinguished from one in which a plaintiff, say, stages a slip-and-fall accident in a casino bathroom. Moreover, it is understandable that plaintiffs would have wished to obtain recovery for these injuries, which were, obviously, no fault of their own. Finally, plaintiffs do assert certain claims, such as their negligent hiring and negligent driving/joint venture theories which, while meritless, are not frivolous and represent the sort of claims which this court would expect to arise from a case of this nature. Indeed, this court believes that plaintiffs would have been well served to concentrate their proof and expert testimony on these more traditional tort claims, rather than "swinging for the fences" with their "mystery man" theory and stubbornly clinging to it, even after it was proven to be completely without foundation.

As a final point, this court notes that, at one point in their brief, plaintiffs draw attention to the fact that, since the shooting in this case, defendant has become more willing to grant requests by patrons for police escorts from the casino. Specifically, plaintiffs write in their brief that:

> In the end, Woods' negligence was reflective of Tunica's negligence-specifically, its failure to institute a procedure or policy to ensure its many guests (who, like Plaintiffs,

14

>would often be carrying significant amounts of cash winnings) were protected while being transported to and from the airport. See Pamela Cook Dep. at 38:11-17. For example, on the occasion in question, ***Tunica did not utilize police escorts*** (even for guests leaving the resort with significant amounts of cash on them)-***but it now does***.

[Brief at 12 (emphasis in original)]. Plaintiffs note this apparent change in the casino's practices almost in passing, and they never follow up with arguments that the circumstances of this particular case gave rise to a duty on the part of defendant to offer *them* a police escort to the airport. Most importantly, plaintiffs' amended complaint includes no allegation that defendant acted negligently in failing to offer them a police escort to the airport, which is presumably why defendant chose not to address this issue in its summary judgment briefing. This strikes this court as understandable, since a defendant is not required to seek dismissal of a claim which is never asserted in the first place.

This court notes that plaintiffs rely upon the deposition testimony of defendant's representative Pamela Cook in support of their brief arguments on this issue, but, as they have done so often in this case, they provide a rather questionable description of that testimony. Specifically, plaintiffs' argument, quoted above, suggests that Cook testified that the casino now routinely provides police escorts to the airport, but her actual deposition testimony was that:

>Q. What's the, I guess, what's the criteria in order to get the escort to the airport?
>A. I don't think we have a criteria other than this guest asked for that.

[Cook Depo. at 39]. Cook thus indicated that a police escort represented a courtesy of sorts to guests who asked for it, rather than something which is done in all cases. At no point in their briefing do plaintiffs suggest that they ever asked for a police escort in this case and, that being the case, they would not fall within the scope of defendant's new policy, even if it had been in effect at the time of this case.

15

This court further observes that the fact that a casino might choose to offer guests a particular service in order to enhance its desirability as a gambling destination by no means establishes that it was legally obligated to offer such a service. It seems entirely obvious to this court that a casino would not be required to provide a police escort in all cases, and it further seems highly doubtful that the local police would be in a position to accommodate such a heavy volume of escort requests, if such were made. This court believes that a casino might at least arguably have a duty to request a police escort under certain unique circumstances, such as if the customer had won a large sum of money and requested an escort. This court hastens to add that it is far from clear that such a duty would exist even in that scenario, but, regardless, the plaintiffs in this case cite nothing about the facts here which would have put defendant on notice that it had a duty to arrange for a police escort or that plaintiffs even wished for it to do so. Quite to the contrary, the only allegation which might even arguably support such a duty here- relating to the alleged "casing" of plaintiffs by the "mystery man" in the video – constitutes nothing more than a mirage arising from outright misrepresentations of the evidence in this case by plaintiffs. This court therefore concludes that plaintiffs have failed to assert a "failure to offer a police escort" claim in their amended complaint and that, even if they had, such a claim would lack merit under the facts of this case.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

This, the 12th day of June, 2025.

   /s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI